AO 91 (Rev. 11/11)  Criminal Complaint

# UNITED STATES DISTRICT COURT
for the
Southern District of Texas

United States Courts
Southern District of Texas
**FILED**
*September 26, 2023*
Nathan Ochsner, Clerk of Court

United States of America
v.
Carl Channing Spence

)
)
)
)
)
)
)
)

Case No. **4:23-mj-1971**

*Defendant(s)*

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.
On or about the date(s) of __July 19, 2022__ in the county of __Chambers__ in the __Southern__ District of __Texas__, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. 1343 | Wire fraud |

This criminal complaint is based on these facts:
See attached affidavit from FBI Special Agent Brannon Coker.

☐ Continued on the attached sheet.

*Complainant's signature*

Brannon Coker, Special Agent, FBI
*Printed name and title*

Sworn to and signed by telephone.

Date: __September 26, 2023__

*Judge's signature*

City and state: __Houston, Texas__     United States Magistrate Judge Sam S. Sheldon
*Printed name and title*

4:23-mj-1971

# .AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT AND ARREST WARRANT

I, Brannon Coker, a Special Agent with the Federal Bureau of Investigation (FBI) being duly sworn, hereby depose and state as follows:

1. I am a Special Agent with the Federal Bureau of Investigation (FBI) and have been so employed since 2002. I am currently assigned to a white-collar crime squad. In my capacity as an FBI Special Agent, I have personally investigated or assisted in investigating criminal matters involving fraud, money laundering, and related offenses. Based on my training and experience as an FBI Special Agent, I am familiar with the means and methods that criminals use to defraud victims. I have also become knowledgeable about the criminal statutes of the United States, particularly the statutes relating to wire fraud found in Title 18 United States Code 1343. I am authorized under Title 28, United States Code, Section 533, to conduct federal criminal investigations concerning any laws of the United States. Further, 18 U.S.C. § 3052 specifically authorized special agents and officials of the FBI to make arrests, carry firearms and serve warrants.

2. The facts in this affidavit come from my personal observations, my training and experience, and information from other investigators, witnesses and documents. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all my knowledge about this matter.

## BACKGROUND AND EVIDENCE OF FRAUD

3. Starting at least as early as January 2022 and continuing through at least August 2023, **CARL CHANNING SPENCE** committed a scheme to defraud investors in order to obtain investor money for his personal use. A review of documentary evidence and witness interviews shows that **SPENCE** perpetrated his fraudulent scheme by, among other things:

- falsely representing that he was registered with the Securities and Exchange Commission ("SEC");

- diverting portions of investors' principal for personal expenses, or to pay previous investors; and

- providing fraudulent statements showing that investors' account balances had grown when, in truth, they were significantly (or nearly completely) depleted— either through investment losses or through **SPENCE's** personal misuse of funds.

4. These fraudulent statements, and others, induced investors to send **SPENCE** even more money and to recruit additional friends and family members.

1

### Overview of Relevant Parties

5. **SPENCE** resided in Dayton, Texas and operated a business called AEI Financial from his residence.

6. **SPENCE** utilized the trading platform TradeStation to conduct day trading. **SPENCE** commingled investor funds into a single account on TradeStation, meaning that he did not allocate specific accounts for a particular investor.

7. Investor/Victim J.C. resided in Dayton, Texas and invested $300,000 with **SPENCE**.

8. Investor/Victim A.M. resided in Cove, Texas (located within the Southern District of Texas) and invested $500,000 with **SPENCE**.

9. Other investor/victims, including ones not specifically named in this Complaint, provided **SPENCE** with money as part of this scheme. These payments continued until at least August 2023.

### **SPENCE Makes Fraudulent Statements in Order to Solicit Investments**

J.C. – $300,000 Invested

10. J.C. and **SPENCE** became acquainted in early 2022 through a mutual friend. At that time, **SPENCE** began to solicit J.C. to invest money with him. **SPENCE** held himself out to be a broker who was registered with the Securities and Exchange Commission (SEC). In a text message, **SPENCE** stated that "'my ssn and DBA' [are] registered with the SEC" and that he had to "report to them all my trades it goes hand in hand with my taxes."[1]



---

[1] This text message was submitted by J.C. as an exhibit to the lawsuit styled *Crowder v. Spence*, Case No. 23-DCV-0266 (Chambers County District Court) (filed April 6, 2023). Both J.C. and A.M. are plaintiffs in this lawsuit, and their attorneys provided evidence relevant to this investigation.

11. These statements were false. A search of the SEC's investment adviser public disclosure website for "Carl Spence" does not generate any results for **SPENCE**. A similar search for "Carl Spence" on FINRA's BrokerCheck website does not reveal any registration for **SPENCE**.

12. Relying on **SPENCE'S** representations, J.C. entered into his first "A.E.I. Financial Advisor Consulting Agreement" with **SPENCE** dated March 3, 2022, and invested $100,000 on or about March 7, 2022. The "A.E.I. Financial Advisor Consulting Agreement" reflected that **SPENCE** would invest the funds given to him and that J.C. would receive an "est[imated] 20-30% R.O.I." The agreement also provided that **SPENCE's** only compensation (other than referrals) would be a 10% monthly fee from any "gains," but only "as long as it meets the projected growth chart."

**COMPENSATION**

The consideration for the Services provided, the Consultant is to be paid in the following manner:

- Other:
  o A 10% charge will be taken monthly of any gains as long as it meets the projected growth chart
  o If services are deemed acceptable, client will refer new members to grow A.E.I.

13. An email obtained pursuant to a search warrant for the contents of **SPENCE's** email account[2] shows that **SPENCE** emailed J.C. a fraudulent "A.E.I. Performance Update" on April 1, 2022. This "performance update" showed a starting balance of $100,000 and a current balance of $106,059.48.



---

[2] During a September 14, 2023 interview, **SPENCE** confirmed that he used the email address carlspencesfe@gmail.com to solicit investors.

3

14. However, bank records indicate that, of the $100,000 **SPENCE** received from J.C., only $63,000 was invested into TradeStation. Bank records further indicate that the rest of J.C.'s money was utilized by **SPENCE** for personal expenses including child support payments, a home mortgage payment, and a $20,000 cash withdrawal. TradeStation records indicate that on March 31, 2022, **SPENCE'S** account balance was $0.66.

15. Over the coming months, J.C. received multiple statements from **SPENCE** which falsely indicated that his investment had grown. He also received several payments from **SPENCE** that purportedly represented "ROI" payments from J.C.'s investment growth. However, bank records show that those payments were actually just money that **SPENCE** obtained from other investors.

16. Based on the fraudulent statements that J.C. received—and the partial "ROI" payments he received—J.C. entered into another contract with **SPENCE** and invested an additional $200,000 on or about October 10, 2022.

17. By October 31, 2022, the account balance for **SPENCE'S** account at TradeStation was $370.85.

A.M. - $500,000 Invested

18. A.M. was introduced to **SPENCE** through J.C.. As a result, A.M. was aware that **SPENCE** sent J.C. account statements showing that his investment had grown. A.M. was also aware that **SPENCE** had paid J.C. partial "ROI" payments.

19. A.M. entered into an A.E.I. Financial Investor Consulting Agreement with **SPENCE** on or about July 18, 2022. On or about July 19, 2022, A.M. transferred $500,000 to **SPENCE**. That transfer was made via ACH from a Bank of America account in the name of Trinspect Services LLC to **SPENCE's** account at Mobiloil Credit Union.

20. Just weeks later, on July 29, 2022, **SPENCE** emailed A.M. an "A.E.I. Performance Update." This document showed a "starting balance" of $500,000 and current balance of $508,455.80.



21.     This performance update was false.  Bank records indicate that only $440,000 of A.M.'s investment had been invested in TradeStation as of July 29, 2022.  Bank records further indicate that some of A.M.'s investment was used for **SPENCE'S** personal expenses, including child support payments, a car payment, and a $5,331.28 Gallery Furniture payment.  In addition, some of A.M.'s investment was used to pay a previous investor.  TradeStation records indicate that on July 29, 2022, **SPENCE'S** account balance was $274,888.82.

22.     A.M. received multiple statements from **SPENCE** indicating that his investment had grown.  Like J.C., A.M. also received "ROI" payments from **SPENCE.**

Additional Investors

23.     Since opening this investigation, I have learned of other individuals who were defrauded by **SPENCE**.  Those investors provided similar accounts of **SPENCE's** behavior.  For example, they reported that they were induced to invest large sums of money with AEI.  Then, they were provided similar "performance updates" demonstrating (falsely) that their investments had grown.

24.     This activity has continued until very recently.  For example, I am aware of a $100,000 investment that an individual, DP, provided to **SPENCE** on August 29, 2023.  Similarly, another individual, ZF, transferred at least $86,000 to **SPENCE** via wire transfers in July and August 2023.

25.     Investors lost money as a result of **SPENCE's** fraudulent scheme.  Although **SPENCE** made some payments to investors (*e.g.*, the "ROI" payments referenced above), he did not have the funds available to pay all of his investors, many of whom have lost significant amounts.

5

26. At this time, the investigation is continuing and agents are still attempting to identify and interview additional individuals who may have been defrauded by **SPENCE**.

### SPENCE'S SEPTEMBER 14, 2023 INTERVIEW

27. On September 14, 2023, I interviewed **SPENCE** at the Chambers County Jail along with Mont Belvieu Police Department Detective Kalyn Perry. I understand that **SPENCE** was being held in custody in connection with a civil contempt proceeding arising out of the lawsuit styled *Crowder v. Spence*, Case No. 23-DCV-0266 (Chambers County District Court). Victims J.C. and A.M. are the plaintiffs in that lawsuit. I have not reviewed all of the pleadings in that lawsuit, but I understand that **SPENCE** is due for a hearing in that case on September 27, 2023.[3]

28. The interview was recorded utilizing the Chambers County Sheriff's Department's recording equipment. At approximately 2:50 into the video, **SPENCE** is advised of his *Miranda* rights. He also signed an FD-395 (Advice of Rights) form.

29. During the interview, **SPENCE** admitted that he would not use the entirety of investor funds for their intended purposes. At around 33:00, he notes that the "majority" of investor funds would go to TradeStation. Further, at around 37:20 in the interview, **SPENCE** notes that he used investor funds to get "all my other stuff taken care of."

30. **SPENCE** also admitted to sending fraudulent statements to investors after losing their money. At around 33:30 in the interview, **SPENCE** is asked, "so why send fraudulent statements to people?" **SPENCE** responded, "so I could just get them covered[. . .]" At around 34:10, **SPENCE** added that he "had to do something different to make up for this." Similarly, at around 56:15, **SPENCE** admitted that he would fabricate the investors' purported returns based on an "equation."

31. At around 1:05:40, **SPENCE** nods his head in the affirmative when he is told "you knew that you were lying to these people."

32. **SPENCE** also acknowledged that he lied to investors when he stated that he was registered with the SEC. At around 40:00, **SPENCE** said that "I did say that to him" and that he made this representation because of "warm and fuzzies."

33. **SPENCE** acknowledged that he lost investor funds. At around 48:00, he stated, "I've been trying to get everybody paid back" and "that's my priority right now, it's paying them back."

---

[3] Approximately 50:40 into the interview, **SPENCE** admits to lying to the court in that litigation when he stated that he had funds available to repay the plaintiffs. He said, "yes, I did – I didn't want them locking any more accounts[.]"

## CRIMINAL CHARGES

34. Based on the information described above, I believe that probable cause exists for the issuance of a Criminal Complaint charging **CARL CHANNING SPENCE** with (1) one count of wire fraud (18 U.S.C. § 1343).

Count One
Wire Fraud (18 U.S.C. § 1343)

35. On or about July 19, 2022, within the Southern District of Texas **and elsewhere**, **SPENCE** knowingly devised and intended to devise a scheme and artifice to defraud by means of fraudulent pretenses and representations. Specifically, **SPENCE** caused Victim A.M. (who resides in Cove, Texas, within the Southern District) to wire $500,000 from A.M.'s account with Bank of America, which is headquartered in North Carolina, to **SPENCE's** account with Mobiloil Credit Union, which is headquartered in Texas, such funds moving in interstate commerce in furtherance of executing the scheme, all in violation of 18 U.S.C. § 1343.

Respectfully submitted,

Brannon Coker
Special Agent, FBI

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone on September 26, 2023.

Honorable Sam S. Sheldon
United States Magistrate Judge